IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JUNE D. FELDSTEIN,                          )
                                            )
             Plaintiff/Counter-Defendant,   )      2:22-cv-01132-RJC
                                            )
        vs.                                 )
                                            )
PNC BANK, N.A.,                             )
                                            )
             Defendant/Counterclaimant.     )
                                            )

**MEMORANDUM OPINION**

Robert J. Colville, United States District Judge

  Before the Court is a Motion for Summary Judgment (ECF No. 27) filed by Defendant/Counterclaimant PNC Bank, N.A. ("PNC").  PNC seeks judgment in its favor with respect to the breach of contract claim set forth against it in the one-count Complaint (ECF No. 1-1) filed by Plaintiff/Counter-Defendant June D. Feldstein ("Plaintiff").  PNC also seeks judgment in its favor on its breach of contract counterclaim set forth against Plaintiff in PNC's Amended Answer, Affirmative Defenses, and Counterclaim (ECF No. 16) for an unpaid principal balance of $296,894.50, plus interest on the principal owed at rate of 2.99% per annum from May 3, 2021, until paid in full.  Plaintiff opposes PNC's Motion for Summary Judgment.  The Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1332(a).  PNC's Motion for Summary Judgment has been fully briefed and is ripe for disposition.

### I.  Procedural History & Factual Background

  PNC removed this action to this Court on August 3, 2022.  PNC filed its Amended Answer, Affirmative Defenses, and Counterclaim on November 21, 2022, and Plaintiff answered the Counterclaim on March 26, 2023.  *See* ECF No. 20.  Following the completion of discovery, PNC

1

filed its Motion for Summary Judgment, along with a Brief in Support (ECF No. 29), a Concise Statement of Material Facts Not in Dispute (ECF No. 28), and an Appendix of Exhibits (ECF No. 28-1 – 28-15), on August 15, 2023.  On September 5, 2023, Plaintiff filed a Brief in Opposition (ECF No. 33) to PNC's Motion for Summary Judgment, as well as a Response (ECF No. 30) to PNC's Concise Statement and her own Concise Statement (ECF No. 30-1).  On October 4, 2023, PNC filed a Reply (ECF No. 36).  Plaintiff filed a Surreply (ECF No. 37) on October 18, 2024.

Unless otherwise noted, the following facts are not in dispute:

On March 16, 2011, Plaintiff executed a Choice Home Equity Line of Credit Agreement ("HELOC"), pursuant to which she promised to pay to PNC "the total of all credit advances, finance charges, together will all costs and expenses."  ECF No. 28 at ¶ 1.  The HELOC provided for a 10-year draw period, during which time Plaintiff could obtain advances of credit with a credit limit of $150,000, and a 30-year repayment period.  *Id.* at ¶¶ 2; 8.  The HELOC required Plaintiff to make minimum monthly payments on the 19th of each month to pay down any indebtedness incurred by Plaintiff under the HELOC.  *Id.* at ¶ 3.  At the time that Plaintiff and PNC entered into the HELOC, Plaintiff executed an open-end mortgage ("Mortgage") and granted PNC a security interest in real property located in Pittsburgh, Pennsylvania, securing Plaintiff's obligations under the HELOC.  *Id.* at ¶ 4.

The HELOC permits PNC to terminate the HELOC and accelerate the outstanding balance in the event that Plaintiff fails to make a timely payment and/or Plaintiff commits fraud on the HELOC.  ECF No. 28 at ¶ 5.  The Mortgage provides that Plaintiff would be considered in default if she failed to make the repayments required by the HELOC.  *Id.* at ¶ 6.  In the event of default, the Mortgage provides that PNC is entitled to accelerate the entire debt under the HELOC and declare the outstanding balance immediately due and payable.  *Id.* at ¶ 7.

Plaintiff utilized the line of credit available to her through the HELOC and carried a significant balance over a period of years.  ECF No. 28 at ¶ 8.  In the two years prior to the transactions at issue in this case, Plaintiff carried a HELOC balance approaching or exceeding her $150,000 credit limit.  *Id.*  On June 24, 2020, PNC received an electronic check payment in the amount of $140,000 from a USAA bank account in Plaintiff's name, which lowered Plaintiff's HELOC balance from $150,000 to $10,000 and increased the amount of credit available to Plaintiff to $140,000 (i.e., $150,000 credit limit - $10,000 balance = $140,000 available credit).  *Id.* at ¶ 9.

On June 28, 2020, Plaintiff requested an $85,000 advance from the HELOC to her PNC checking account to fund an $82,500 wire transfer to a third-party bank account.  ECF No. 28 at ¶ 10.  Plaintiff herself subsequently confirmed this request via a June 29, 2020 email.  *Id.*  On June 30, 2020, Plaintiff separately requested a $55,000 advance from the HELOC to her PNC checking account to fund a $47,500 wire transfer to a third-party bank account.  *Id.* at ¶ 11.  Plaintiff herself subsequently confirmed this request via a July 1, 2020 email.  *Id.*  PNC processed each of these requested transactions.  *Id.* at ¶ 12.

On July 1, 2020, i.e., after the June 28 and June 30, 2020 transactions were processed by PNC, the $140,000 payment received by PNC on June 24, 2020 was reversed, resulting in Plaintiff's HELOC account becoming significantly overdrawn.[1]  ECF No. 28 at ¶¶ 12-13.  Taking notice of these transactions, PNC attempted to recover the June 28 and June 30, 2020 wire transfers.  *Id.* at ¶ 14.  PNC was unable to recover the June 28, 2020 $82,500 wire transfer, but successfully recovered the June 30, 2020 $47,500 wire transfer, and those recovered funds were returned to the Plaintiff's checking account.  *Id.*

---

[1] By the Court's math, the account balance at that juncture would have been approximately $290,000 in the absence of interest or other fees ($150,000 balance after reversed payment + $85,000 advance + $55,000 advance = $290,000).

On July 6, 2020, PNC received an electronic payment in the amount of $285,000 from a TD Bank account in Plaintiff's name paying down a significant portion of the balance (including the significant overdraft) owed on the Plaintiff's account.[2]  ECF No. 28 at ¶ 15.  Plaintiff was aware of this putative payment and discussed the same with PNC representatives.  *Id*.  On July 13, 2020, Plaintiff requested a $145,000 advance from the HELOC to her PNC checking account to fund a $145,000 wire transfer to a third-party bank account.  *Id.* at ¶ 16.

Citing fraud concerns, PNC placed a hold on Plaintiff's account and declined to process the $145,000 wire transfer requested by the Plaintiff.  ECF No. 28 at ¶ 16.  Plaintiff contacted PNC by phone on multiple occasions in late July 2020 to request that the June 30, 2020 recovered wire transfer and the July 13, 2020 wire transfer request be processed and paid as previously requested by Plaintiff.  *Id.* at ¶ 17.  Following these phone calls, PNC advised Plaintiff via a July 22, 2020 email that PNC suspected that the transactions at issue were fraudulent, and further advised that PNC would not process the requested payments unless Plaintiff provided PNC with additional information concerning the legitimacy of these payments.  *Id.* at ¶ 18.  On both July 23, 2020 and July 24, 2020, Plaintiff responded in writing to PNC's July 22, 2020 email, providing PNC with some of the information requested by PNC.  *Id.* at ¶ 19.[3]  PNC refused to complete Plaintiff's request for the $145,000 wire transfer from the checking account, and these funds were ultimately transferred back to the HELOC.  *Id.* at ¶ 20.

On September 16, 2020, the July 7, 2020 $285,000 HELOC payment was reversed by TD Bank, resulting in a HELOC balance in excess of $290,000, including approximately $150,000 in

[2] While Plaintiff admits that this payment came from a bank account in her name, *see* ECF No. 30 at ¶ 15, she avers that she did not *personally* send the July 6, 2020 payment of $285,000 to PNC, *see* ECF No. 30-1 at ¶ 1.

[3] PNC asserts that Plaintiff, by way of these emails, also reiterated her request that PNC process her fund transfer requests, and Plaintiff denies that the emails reiterated a request for fund transfers.  *See* ECF No. 28 at ¶ 19; ECF No. 30 at ¶ 19.  Following review of the emails at issue (Exhibit I), Plaintiff is correct that the emails do not contain an explicit request that PNC process Plaintiff's fund transfer requests.  ECF No. 28-9 at 2-3.

debt that was owed prior to June 24, 2020, i.e., prior to the first transaction at issue in this case. ECF No. 28 at ¶¶ 21-22.  Plaintiff failed to make the required monthly installment payment owed under the HELOC on October 19, 2020, and has not made a payment since.  *Id.* at ¶ 23.  On November 4, 2020, PNC notified Plaintiff in writing that her HELOC payment was past due and further requested immediate payment.  *Id.* at ¶ 24.  On March 22, 2021, PNC notified Plaintiff in writing that the amounts due under the HELOC were past due and that Plaintiff was in default, and further demanded that Plaintiff pay the outstanding installment payments due at that time ($10,414.06) by no later than April 21, 2021.  *Id.* at 25; ECF No. 28-13.  On May 5, 2021, PNC notified Plaintiff in writing that the amounts due under the HELOC were past due and that Plaintiff was in default, and further demanded that Plaintiff pay the outstanding installment payments due at that time ($11,878.51) by no later than June 4, 2021.  ECF No. 28 at ¶ 26; ECF No. 28-14.  On May 3, 2021, PNC "charged off" Plaintiff's HELOC and accelerated her entire outstanding balance of $296,894.50.  ECF No. 28-15.

PNC asserts that Plaintiff remains in default under the HELOC with respect to the entire $296,894.50 unpaid principal balance, plus interest, and that said amount remains due and owing. ECF No. 28 at ¶¶ 27-28.  Plaintiff admits that she is in default and owes payment for all amounts disbursed under the HELOC (and any accrued interest and late fees associated with those amounts) prior to the transactions at issue in this case,[4] but she asserts that she is not in default and does not owe payment for the $139,000[5] that resulted from the June 28 and June 30, 2020 transactions (and any accrued interest and late fees associated with that amount).  ECF No. 30 at ¶¶ 27-28.

---

[4] Given Plaintiff's admission and acknowledgment that she is in default and owes, at least, $150,000 in principal and all interest and fees associated with that principal amount, PNC would be, at a minimum, entitled to summary judgment on its breach of contract counterclaim as to those amounts at this time.  Accordingly, the only unresolved issue is whether Plaintiff owes payment related to the June 28 and June 30, 2020 withdrawals totaling $140,000 and any interest and fees associated with that amount.

[5] By the Court's math, the amount associated with the June 28 and June 30, 2020 transactions was $140,000.

In her own Concise Statement, Plaintiff asserts that she is an elderly woman, and that she was the victim of a scam. ECF No. 30-1 at ¶ 2. She further avers that PNC has denied all knowledge of the scam to which Plaintiff refers. *Id.* at ¶ 3.

## II.    Legal Standard

Summary judgment may be granted where the moving party shows that there is no genuine dispute about any material fact, and that judgment as a matter of law is warranted. Fed. R. Civ. P. 56(a). Pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In evaluating the evidence, the court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).

"The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact." *Bavone v. Primal Vantage Co., Inc.*, No. 2:21cv1260, 2024 WL 756815, at *1 (W.D. Pa. Feb. 21, 2024). When the moving party carries their burden, the summary judgment "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Further:

> A non-moving party may not successfully oppose a summary judgment motion by resting upon mere allegations or denials contained in the pleadings, or by simply reiterating those allegations or denials in an affidavit. *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). Rather, the non-moving party must offer specific evidence found in the record that contradicts the evidence presented by the movant and indicates that there remain relevant factual disputes that must be resolved at trial. *See id.* If the non-moving party does not respond in this manner, the court, when appropriate, shall grant summary judgment. Fed.R.Civ.P. 56(e).

*Mahaven v. Pulaski Twp.*, 139 F. Supp. 2d 663, 664–65 (W.D. Pa. 2001), *aff'd*, 45 F. App'x 155 (3d Cir. 2002); *see also Bavone*, 2024 WL 756815, at *1 ("Likewise, mere conjecture or speculation by the party resisting summary judgment will not provide a basis upon which to deny the motion.").

In ruling on a motion for summary judgment, the court's function is not to weigh the evidence, make credibility determinations, or determine the truth of the matter; rather, its function is to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150–51 (2000) (citing decisions); *Anderson v. Liberty Lobby*, 477 U.S. 242, 248–49 (1986); *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n. 3 (3d Cir. 1998).

The mere existence of a factual dispute, however, will not necessarily defeat a motion for summary judgment. Only a dispute over a material fact—that is, a fact that would affect the outcome of the suit under the governing substantive law—will preclude the entry of summary judgment. *Liberty Lobby*, 477 U.S. at 248.

### III.   Discussion

Plaintiff's Complaint, which sets forth a single breach of contract claim, originally relied on allegations that she was the only authorized signer under the terms of the HELOC, and thus the only person who could make transactions under the HELOC. She further alleged that third parties (who were not authorized signers) had conducted the "unauthorized" transactions at issue without Plaintiff's knowledge and consent, and that she only learned of the transactions themselves in October of 2020. In the Complaint, Plaintiff asserted that PNC breached the express terms of the HELOC by processing these purportedly "unauthorized" transactions. Plaintiff now admits, however, that *she*, and not third parties, requested the withdrawals and wire transfers at issue from

PNC, that she communicated with PNC via email to confirm the transactions, that the (eventually reversed) payments to the HELOC came from bank accounts in her name, and that she communicated with PNC on several occasions requesting that PNC process her transfer requests. In short, Plaintiff authorized the transactions at issue.[6]

According to Plaintiff, she fell prey to a fraudulent scheme.  That said, the true nature of this purported scheme remains unclear, as, given Plaintiff's admissions, the scheme is clearly different than that alleged in the Complaint, and Plaintiff has submitted no exhibits and very limited briefing in opposing summary judgment.  As best as the Court can tell, Plaintiff now asserts that, acting at the behest of third parties, including an individual with whom Plaintiff developed a romantic relationship, Plaintiff withdrew large sums of money from the HELOC, and then transferred or attempted to transfer those funds to the third-party fraudsters.  Plaintiff now argues that PNC had a duty to detect, prevent, or stop this fraudulent activity, which, again, is notably distinct from the activity alleged in the Complaint.  Thus, while Plaintiff's original breach of contract theory relied on an alleged breach of the express terms of the HELOC through PNC's acceptance of HELOC transaction requests from third parties who were not authorized to make such transactions, Plaintiff has abandoned that theory and now relies exclusively on PNC's purported breach of the implied duty of good faith and fair dealing through its failure to detect potential fraud and stop Plaintiff from pursuing otherwise permissible and authorized transactions.

Initially, PNC asserts that Plaintiff has waived any opportunity to raise this "new" theory of liability at this juncture.  In response, Plaintiff argues that, because a breach of the implied duty of good faith and fair dealing is subsumed within a breach of contract claim under Pennsylvania

---

[6] *See* Answer to Counterclaim ¶ 12 ("It is admitted only that the specified credit advances were [expressly] authorized by Plaintiff.").

law, Plaintiff has not asserted a new claim or cause of action. She further argues that PNC was on sufficient notice that Plaintiff intended to pursue a cause of action based upon PNC's failure to detect fraud. In essence, Plaintiff asserts that, despite her failure to accurately identify the nature of the fraud at issue in her Complaint,[7] she set forth allegations placing PNC on notice of the ultimate theory of liability she intended to pursue. *See* Compl. ¶ 40 ("40. Defendant should have noticed the unusual activity, at a minimum by noticing the three large payments and eight funds reversals.").

The Court agrees with PNC that Plaintiff now relies on a theory of liability entirely different than that set forth in her Complaint. As noted, Plaintiff's Complaint asserted that only authorized HELOC signers were permitted to initiate HELOC withdrawals, transfers, and deposits. The essence of her claim was that PNC breached the HELOC by processing unauthorized transactions initiated by individuals other than Plaintiff, the only authorized signer. In the Complaint, Plaintiff asserted that she was entitled to an offset of the amounts owed on the HELOC for funds withdrawn by persons other than the Plaintiff.

As noted throughout this Memorandum Opinion, Plaintiff's theory of liability has changed significantly, as she now asserts that PNC should have detected the (factually unsupported) third-party fraud at issue and stopped Plaintiff *herself* from conducting authorized transactions that Plaintiff was expressly permitted to make under the terms of the HELOC, i.e., requesting advances under her line of credit following the June 24, 2020 $140,000 payment. Essentially, Plaintiff now asserts that PNC owed Plaintiff a duty to save her from third-party fraudsters who played no direct role, at least with respect to PNC, in the transactions at issue. Setting the merits of such a claim aside, Plaintiff's present theory of liability is certainly an about-face from the straightforward

---

[7] Though the same is notable because Plaintiff, as the alleged victim of the fraud, could and should have been able to accurately describe the fraud in the Complaint.

breach of contract theory of liability articulated in Plaintiff's Complaint, as she has entirely contradicted the following allegations and sworn statements in her Complaint and the Affidavit attached thereto: (1) that unauthorized third parties, and not Plaintiff, conducted the transactions at issue "without [Plaintiff's] knowledge or consent"; (2) that "[t]his case only involves claims for money transfers [Plaintiff] did not authorize"; and (3) that Plaintiff only discovered the existence of the transactions at issue, which, again, she has now admitted to having conducted, in October of 2020, i.e., months after Plaintiff herself initiated the transactions.  Compl. ¶¶ 28-33, ECF No. 1-1.

"District Courts have broad discretion to disallow the addition of new theories of liability at the eleventh hour."  *Carr v. Gillis Associated Indus., Inc.*, 227 F. App'x 172, 176 (3d Cir. 2007). Again, Plaintiff has articulated a new theory of liability in an effort to defeat summary judgment, and the Court finds the same to be untimely.

Plaintiff argues that her recent shift in her theory of liability is permissible because she has not asserted a new *claim* or *cause of action* in her summary judgment briefing.  This argument is a red herring.  The district court and the Third Circuit in *Carr* were confronted with a single, timely-filed claim supported by one timely *theory of liability* and one untimely *theory of liability*. *See Carr*, 227 F. App'x at 175 ("In this case, Carr put forward two distinct *theories of failure to warn liability*, one before Gillis submitted his expert report and one after." (emphasis added)); *see also Dewees v. Haste*, 620 F. Supp. 2d 625, 635 (M.D. Pa. 2009), *aff'd*, 386 F. App'x 133 (3d Cir. 2010) ("However, Plaintiff *has from the outset grounded his claim of retaliation on the termination of his employment*; the complaint cannot reasonably be read to *include a claim for retaliation based upon the referral of Plaintiff's potential return to the Prison Board*[,] and to the extent Plaintiff is attempting to expand upon his original allegations through argument in his brief[,] it is

impermissible." (emphasis added)); *Diodato v. Wells Fargo Ins. Servs., USA, Inc.*, 44 F. Supp. 3d 541, 557 (M.D. Pa. 2014) (rejecting as untimely plaintiff's effort to assert an "amended claim for breach of contract in his opposition brief.").  Both the district court and the Third Circuit in *Carr* considered the first theory of liability on the merits, with the second theory of liability being decided only on timeliness grounds.  The Court finds that Plaintiff has attempted to amend her breach of contract claim in summary judgment briefing.  This amendment is untimely and impermissible.  *See Bell v. City of Philadelphia*, 275 F. App'x 157, 160 (3d Cir. 2008) ("A plaintiff 'may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.'").

In this case, Plaintiff's attempted amendment is particularly obvious and notable.  Not only has she changed her theory of liability, but she has also attempted to amend (by omission) the Complaint's now-thoroughly contradicted fundamental factual allegations.  There is simply no excuse for Plaintiff's late change in her theory of liability, which comes only after discovery has concluded and now that it is plain that Plaintiff's original and plainly stated theory of liability and allegations in support thereof, i.e., that PNC permitted unauthorized transactions initiated by third parties without Plaintiff's knowledge and consent, were entirely inaccurate.  Again, Plaintiff, as the alleged victim of the fraud, could and should have been able to accurately describe the fraud at issue in this case in the Complaint, and could and should have more clearly pled the basis upon which she sought relief.  This untimely amendment alone, given that Plaintiff's only theory of recovery and only defense relies on her newly averred assertions of PNC's purported breach of the implied duty of good faith and fair dealing, establishes that summary judgment in PNC's favor is warranted on Plaintiff's claim and PNC's counterclaim.

Turning to the evidence currently of record, while the Court acknowledges that it cannot weigh the evidence or make credibility determinations in ruling on a motion for summary judgment, it bears again noting that the allegations in Plaintiff's Complaint and the sworn statements in the Affidavit attached to the Complaint (and previously submitted to PNC) have now been entirely contradicted by Plaintiff's recent admissions. The Court notes the same not for purposes of assessing Plaintiff's credibility or the weight to afford evidence, but, rather, to note that there is currently little, if any, concrete evidence of record demonstrating the *actual* fraudulent scheme at issue. That is, Plaintiff has only submitted a single self-serving Affidavit attached to her Complaint that asserts that she did not receive the benefit of the withdrawals or transfers. As noted above, that document describes a fraudulent scheme quite different than the one that Plaintiff now asserts actually took place.

Further, Plaintiff has submitted no exhibits in opposition to summary judgment, has admitted or admitted in part each of the materials facts set forth by PNC, and has offered less than eight total pages of briefing in opposition to summary judgment. Where there is little to no evidence (or even argument) as to the actual fraudulent scheme at issue, including Plaintiff's interactions with the third parties and the manner in which the scheme was carried out, the Court finds it unlikely that there could exist a genuine issue of material fact for the jury to resolve as to either Plaintiff's claim or PNC's counterclaim, as PNC's failure to detect and prevent the fraudulent scheme is the crux of both Plaintiff's case and her defense. *See Mahaven*, 139 F. Supp. 2d at 664 ("A non-moving party may not successfully oppose a summary judgment motion by resting upon mere allegations or denials contained in the pleadings, or by simply reiterating those allegations or denials in an affidavit."). This, as well, is an independent basis upon which summary judgment could be granted.

That said, and in an abundance of caution, the Court will turn to the merits of the claim and counterclaim at issue, as there exists at least some circumstantial evidence as to the fraud at issue, i.e., Plaintiff did (inaccurately) report fraud to PNC in January of 2021, *see* Compl. Ex. C, ECF No. 1-1 at 34; PNC harbored concerns over fraud and placed a hold on Plaintiff's account; and wire transfers were processed and sent to individuals other than Plaintiff following the June 28 and June 30, 2020 withdrawals.  In light of the same, and notwithstanding the fact that Plaintiff fares no better when looking to the merits of her claim and PNC's counterclaim, the Court addresses those claims as follows.

"Pennsylvania law requires that a plaintiff seeking to proceed with a breach of contract action must establish '(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages.'"  *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (quoting *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. 1999)).  PNC has introduced uncontroverted evidence that Plaintiff has breached the terms of the HELOC, including Plaintiff's failure to repay the HELOC balance that remains pending following the transactions at issue in this case.  The HELOC provides:

> Promise to Pay.  You promise to pay PNC Bank, National Association, or order, the total of *all credit advances*, finance charges, and other charges, together with all costs and expenses for which you are responsible under this Agreement or under the "Mortgage" which secures your credit line.

ECF No. 28-1 at 1 (emphasis added).  It further provides:

> You agree not to attempt, request, or obtain a credit advance that will make your Credit Line Account balance exceed your Credit Limit.  Your Credit Limit will not be increased should you overdraw your Credit Line Account.  *If you exceed your Credit Limit, you agree to repay immediately the amount by which your Credit Line Account exceeds your Credit Limit, even if we have not yet billed you.*

*Id.* at 2 (emphasis added).  Plaintiff admits that she was an authorized signer under the HELOC and that she requested and confirmed the withdrawals and transfers that ultimately resulted in a

HELOC balance in excess of $290,000, well above her credit limit.  She further admits that she has not made a required monthly HELOC payment since September of 2020.  Accordingly, Plaintiff's failure to pay the HELOC balance and her failure to repay overdrawn funds constitute clear breaches of the HELOC under its plain terms, unless Plaintiff can point to some express or implicit provision of the HELOC that excuses her performance under the contract.  She has not.

As noted elsewhere, Plaintiff now concedes that she cannot point to an express provision of the HELOC to support her request that she be relieved of the obligation to pay the approximately $140,000 (plus interest and late fees) that accrued after the June 24, 2020 $140,000 payment (before eventual reversal).  *See* Br. in Opp'n 3, ECF No. 33 (acknowledging that "the HELOC does not include any express terms requiring PNC to detect, prevent, or stop unauthorized or fraudulent activity on the account.").  Instead, Plaintiff argues that PNC breached the implied duty of good faith and fair dealing in its performance under the HELOC, asserting that "[t]he implied covenant of good faith and fair dealing requires that Defendant act with a degree of diligence to detect, prevent, or stop unauthorized and/or fraudulent activity on Plaintiff's HELOC."[8]  Br. in Opp'n 4, ECF No. 33; *see also id.* at 4 ("[p]ermitting unauthorized and/or fraudulent activity on Plaintiff's HELOC was clearly a lack of diligence and a knowing imperfect performance of the terms as only Plaintiff was authorized to use the HELOC.").  She further argues that PNC "was not diligent in following the terms of the HELOC agreement [because it allowed Plaintiff's] balance to exceed the credit limit[,]"[9] primarily by failing to identify the June 24, 2020 $140,000

---

[8] As addressed at length elsewhere, there is no evidence of record that the transactions at issue were "unauthorized," as Plaintiff herself has now admitted that the transactions were expressly authorized.  *See* Answer to Counterclaim ¶ 12 ("It is admitted only that the specified credit advances were [expressly] authorized by Plaintiff.").  Accordingly, Plaintiff cannot rely on a theory that PNC permitted unauthorized transactions, and the only remaining question is whether PNC owed a duty to detect, prevent, or stop the fraudulent activity at issue, and whether it breached that duty.

[9] The assertion that PNC "allowed" the account to be overdrawn is entirely contradicted by the record.  On June 24, 2020, a $140,000 payment was received by PNC, from a bank account in Plaintiff's name, that lowered the HELOC

payment as "suspicious" and by not verifying or waiting to confirm the payment.  *Id.*  Plaintiff

further faults PNC's failure to intervene and place a hold on Plaintiff's account sooner.

"Every contract in Pennsylvania imposes on each party a duty of good faith and fair dealing

in its performance and its enforcement.  *Donahue v. Fed. Exp. Corp.*, 753 A.2d 238, 242 (Pa.

Super. 2000).  The Superior Court of Pennsylvania has explained:

> "Good faith" has been defined as "[h]onesty in fact in the conduct or transaction
> concerned."  13 Pa.C.S.A. § 1201.  The breach of the obligation to act in good faith
> cannot be precisely defined in all circumstances, however, examples of "bad faith"
> conduct include: "evasion of the spirit of the bargain, lack of diligence and slacking
> off, willful rendering of imperfect performance, abuse of a power to specify terms,
> and interference with or failure to cooperate in the other party's performance."
> [*Somers v. Somers*, 613 A.2d 1211, 1213 (Pa. Super. 1992)].

*Kaplan v. Cablevision of PA, Inc.*, 671 A.2d 716, 722 (Pa. Super. 1996).  That said, "[t]he law will

not imply a different contract than that which the parties have expressly adopted[,]" and "[t]o imply

covenants on matters specifically addressed in the contract itself would violate this doctrine."

*Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 388 (Pa. 1986).

The duty Plaintiff seeks to imply in this case would contradict the express terms of the

HELOC, and, for that reason, Plaintiff cannot rely upon the implied duty of good faith and fair

dealing to support her claim or her defense to PNC's counterclaim.  Under the HELOC, Plaintiff

is responsible for repaying unauthorized transactions made on the HELOC.  ECF No. 28-1 at 2-3.

The HELOC also requires Plaintiff to pay any debts arising out of illegal or unlawful transactions.

*Id.*  The HELOC provides that: "[PNC] *may* decline to authorize any transaction that [PNC]

believe[s] poses an undue risk of illegality or unlawfulness.  Notwithstanding the foregoing, [PNC]

may collect on any debt arising out of any illegal or unlawful transaction."  *Id.* at 3 (emphasis

---

balance to $10,000, resulting in an available line of credit of $140,000.  Due to that payment, the subsequent
withdrawals of $85,000 and $55,000 were not in excess of the credit limit.  It is only the subsequent reversal of
Plaintiff's $140,000 payment on July 1, 2020, after PNC had processed June 28 and June 30, 2020 transactions, that
resulted in the overdrawn status of the account.

added).  The HELOC further assigns responsibility for any requests made in excess of the credit limits, i.e., overdraws, to Plaintiff.  In sum, fraudulent activity and overdrawn funds, and responsibility for the same, are expressly addressed in the plain terms of the HELOC, and it would be improper to impose a duty in excess of the parties' agreement.  It is telling that Plaintiff fails to cite a single case where a court found that the implied duty of good faith and fair dealing applied in a similar context.

Further, with respect to the issue of whether there is evidence that PNC breached any implied duty, the Court notes that, far from indicating bad faith conduct on PNC's part, the evidence of record tends to establish that PNC acted in good faith in addressing the issues presented herein.  PNC intervened after the reversal of the $140,000 payment, and it actually managed to recover the $47,500 wire transfer and returned those funds to Plaintiff's checking account.[10]  From that point forward, PNC contacted Plaintiff to express concern over potential fraud,  provided Plaintiff with advice and information about fraud, placed a hold on Plaintiff's bank account, and prevented a further wire transfer of $145,000 to a third-party bank account despite multiple requests from Plaintiff that the transfer be processed.  The Court again notes that PNC was under no express contractual duty to take these actions,[11] but doing so certainly undermines any assertion

---

[10] The return of these funds is not explicitly addressed by Plaintiff.  Even if this Court were to find that summary judgment was not appropriate at this juncture, the Court would find on this record that any amount sought by Plaintiff should be reduced by the amount of $47,500.  *See* Br. in Supp. 3-4 n.4 ("The Plaintiff retained these recovered funds, but did not use the recovered funds to pay down the indebtedness incurred related to the June 30, 2020 payment.").  This establishes that the actual dollar amount at issue on Plaintiff's claim is the $82,500 wire transfer that PNC did not recover, despite its efforts to do so.

[11] Though the Court notes that an email from a PNC representative to Plaintiff provided: "Again, our main priority is to ensure you and your funds are protected, thus the need for all the questions[,]" and indicated that PNC maintained a "fraud review team" that is "is very good at pointing out items that stand out as a potential fraud."  ECF No. 28-8 at 1.  The same is seemingly consistent with the HELOC provision quoted above: "[PNC] may decline to authorize any transaction that [PNC] believe[s] poses an undue risk of illegality or unlawfulness.  Notwithstanding the foregoing, [PNC] may collect on any debt arising out of any illegal or unlawful transaction."  While PNC is permitted under the HELOC to intervene when it detects fraud, the HELOC imposes no affirmative duty to detect and prevent fraud.

of bad faith conduct on PNC's part.  Even if the implied duty of good faith and fair dealing extended so far such that PNC owed a duty to act in good faith in detecting and preventing fraud, no reasonable jury could conclude, on this record, that PNC displayed a lack of diligence such that the duty of good faith and fair dealing was breached in this instance.

In short, Plaintiff has not and cannot point to any contractual duty, whether express or implied, owed by PNC to Plaintiff to prevent the fraud at issue.  While the Court is not unsympathetic to the (ultimately unsupported) assertions of fraud set forth by Plaintiff, it is Plaintiff who bears responsibility in this case.  Under the express terms of the HELOC, Plaintiff owes the outstanding balance of the HELOC.  PNC has established that there is no genuine dispute about any material fact, and that judgment as a matter of law is warranted in its favor on both Plaintiff's breach of contract claim and on PNC's breach of contract counterclaim.  For these reasons, the Court will enter summary judgment in PNC's favor.

### IV.    Conclusion

For the reasons discussed above, the Court will grant PNC's Motion for Summary Judgment.  An appropriate Order of Court follows.

BY THE COURT:

*/s/Robert J. Colville*
Robert J. Colville
United States District Judge

DATED: July 16, 2024

cc: All counsel of record